When I started practicing law in federal court, probably the first trial I ever did was a federal drug conspiracy trial. When I did that trial, I was one of several other co-defendants in the case and I was like the new kid on the block. I was doing this trial with all of these other defense counsel who were vastly more experienced than I was and we were all reviewing their jury instructions. I was reading the jury instructions and being diligent and having read the guidelines and going through the jury instructions. I came upon that instruction that had been given for years, drug type and drug quantity makes no difference. I turned to the other counsel and said, this doesn't seem right. How could this be? Look at the guidelines. How could this be the law? Everyone turned to me and said, kid, don't worry about it. That's the law. Let's move on. We moved on. The years went by and Apprendi came out. After Apprendi came out, the defense counsel, all of us throughout the country, started filing these motions. The motions we started filing were, my client should only have offense level 12 because the drug quantities were not proven to the jury. Every circuit came out and said, kids, don't worry about it. They all turned to us and they all said to me, and I wrote my briefs to the Ninth Circuit based upon those issues. One opinion after another came out and said, statutory maximum, that's what we're talking about. You guys don't, meaning us, the defense counsel, saying we didn't understand what statutory maximum was. The statute said it was 20 years and as long as the guideline range was within those 20 years, that's all that mattered. And now I come upon DUPAS and I come upon all of these circuits that have decided this due process issue that we're now arguing about and we're discussing. And they all say the same thing. They all say, well, we're now talking about statutory maximum. And they say, well, the reason there's no problem is because the statutory maximum, for example, is 20 years. As long as he gets sentenced within those 20 years, there's no problem. You know what? That's not what statutory maximum is. Statutory maximum is what we have learned from the whole series of cases, from Apprendi to Blakely to Booker. Statutory maximum is what the facts are, what the indictment says, and what is proven to a jury upon facts beyond a reasonable doubt. And that brings me to misdemeanor now. Misdemeanor goes to trial. Misdemeanor is convicted of certain things. And I had just, of course, listened in interest to the previous argument having to do with loss and about, you know, how they determined loss in the St. Luke's case. And I was thinking about a Mr. Mena's case. In Mr. Mena's case, he had basically, if you looked at what he had been convicted on by a jury, his sentence would have probably been about three years under the guidelines. Instead, what the court did is the court determined his loss. And the loss that they determined put him into a higher guideline range. Basically, his guideline range was doubled at that point. And rather than receiving a three-year sentence, he received basically a six-year sentence. What effect does his participation in a RICO venture have on the amount of... Well, you know, I think that it's a real issue on all that because... Well, isn't what is attributable one attributable to all that occurred during the period of the conspiracy? I don't think that was really proven at the... I think what the problem was is, one, is whether or not he had joined the conspiracy at a certain time. And, two, whether or not those amounts, the way... I didn't ask for an application. I'm sorry. I was trying to get a general rule, if I could, with you. No, I think that a person in the RICO circumstance is responsible for what he is basically foreseeable. And that entire venture, yes, Your Honor. And do you disagree with the computation that was made on the basis of the wire evidence? I believe the way it was computed in this case, Your Honor. And the reason I believe there's a problem is because the way it was computed in this case, it was a confidential informant who had received payments over the years. And basically what they did is that they took that confidential, the money that he received, attributed those amounts to everyone who was a participant in this conspiracy and determined that's how the entire conspiracy is responsible. So they took one person and they extrapolated it out to six or seven other individuals. It would be two persons because the one under wire was always with another agent, right? That is correct, sir. Those agents from time to time change. So you're getting a mix of all of the inspectors that were on the take, right? Well, you were receiving the way you had an individual who was a confidential informant who was receiving payments. He would take those payments and turn them over to law enforcement at that time. And so it was those payments that were attributed to the other individual. The confidential informant was working with the FBI agents every night that he went out and had a wire during all the conversations that took place in the liquor sales place, whether it's a bar or a topless dancing outfit, whatever it was, and then accounted for it immediately after. So the conversations are all there that all of the conspirators were doing the same thing. And he went with a variety of them. So you get a pretty good cross-section of what the enterprise was taking, right? I don't believe we are. And I don't believe we are when we're dealing exactly in Mr. Mina's case because I don't think it's just merely a matter of saying, well, this person went out. We're not disputing, obviously, that the confidential informant received these type of payments. But as far as to determine the loss, to determine what the entire conspiracy is taking, as far as determining when Mr. Mina, as the Court is aware, Mr. Mina was disputing whether or not he was even a member of this conspiracy, but exactly when he started in that conspiracy and when he ended in conspiracy. And I don't think it's merely a matter of saying the entire conspiracy is responsible for X number of dollars because, you know, the confidential informant received, let's say, $5 over six months and will just multiply it out and attribute the same amounts to all the individuals. How would you compute it? Well, the way it should be done, I mean, the argument, of course, first of all, is that it should have been given to the jury and the jury should have determined it. And the reason that's important is because of these exact issues. I mean, the reason it's important is because we're determining someone's sentence based upon, you know, speculation at this time, based upon facts that are not proven beyond a reasonable doubt, based upon. And so the way I would do it is I would have had a jury decide. And you cited DuPas. Are you saying DuPas doesn't apply or DuPas is wrongly decided? DuPas is wrongly decided. Okay. And that's what I'm saying. DuPas is wrongly decided. I just wanted to clarify, but you can go ahead and finish answering your specific question. Certainly. Now, let's say for the moment, obviously, that that's not what happened in this case and now we have to go to the next step, how should loss be determined? Well, the loss should be, you know, if the court's going to say it shouldn't be determined by a jury, the loss should still be determined. And obviously the position where defense is always going to take it should always be based upon a, you know, proof beyond a reasonable doubt. But even in this circumstance where we have doubled an individual sentence, basically, from three years to six years, the burden of proof at minimum based upon holdings at a Ninth Circuit, because I believe there is this double and increase should be at least on a burden of proof of clear and convincing evidence. That burden is not upon the defendant. That burden should be upon the government. And what should be is there should have been an evidentiary hearing at the time of sentencing in which they should have directly computed the loss attributed to Mr. Mina. When did Mr. Mina start in this conspiracy? When did he end in the conspiracy? How much money did Mr. Mina actually receive? How much, at least what they can prove. In the calculation that they made, what did they assume with respect to Mr. Mina when he started and when he ended? It's not real clear in the record, Your Honor, as far as what. Is it clear as to when he ended? They just, basically, in the record it's not clear when he ended. They just attributed it, when the conspiracy ended, which was sometime, they claim sometime in December of I believe it was 2001 when they would have claimed. That was the guideline they used. That was the guideline that was used. So your dispute, as I understood it, maybe that's why I'm asking the question, was really as to when he entered the conspiracy. That is correct, yes. You were quarreling with 1999, and when in 1999 is your understanding that they picked up his participation? You know, the way it was calculated is that they just attributed the same amounts to every individual. Well, they took a formula and they assumed the number of months or the years, sort of they took this notion and multiplied it, factored the amount of time and so on and so forth. But for Minna, at least in the supplemental PSR as I read it, they were addressing in some part your complaint about 1999. Right. And so they adjusted by a few months in that regard, Your Honor. So what would you be asking us to do if we agreed with you that more information needed to be done? An evidentiary hearing to zero in on the 1999 issue or the entirety? The entirety. And change the whole method of computation? That is correct. I mean, this method of attributing loss of an entire conspiracy based upon one confidential informant, Your Honor, is speculative. All right. So what you're saying is this isn't just a question of kicking it back for a hearing on Mr. Minna. You'd like the whole thing kicked back to the judge under a clear and convincing standard to come up with a different kind of calculation. They can't extrapolate. They can't. It has to be some more particularized approach. Yes, Your Honor. And what's your authority for the notion that on calculating amounts, because I'm familiar at least with one case where, since I wrote it, I can't remember the name of it, but it was one of these drug things where they were extrapolating from a course of conduct. And I think we said that it's within the province of the district court to make some kind of reasonable estimate that doesn't have to be an accounting certainty. So I'm trying to figure out what's the strongest case you have for saying what you're asking for in terms of a hearing is pretty much called for by our case law. You know what? I think the strongest case is Apprendi, Your Honor. Apprendi. Okay. I mean, I really, because of what the impact that it has on someone's sentence, Your Honor, and the fact that we have a man whose sentence has now been doubled based upon this circumstance, based upon that, an individual like that, there has to be more than just this type of what I call speculative sort of analysis that is to determine the amount of his loss. Because one thing that we have seen is since Booker and Fanfan and is in at least in my limited experiences, Your Honor, is that so much of it is still, you know, that we now call them advisory guidelines, but it's almost been done with a wink, they're advisory guidelines. And we have so much of the circumstance where the guidelines are just being followed, and we even have many other circuits ruling that, you know, if a sentence is done within the guideline range, they're presumptively valid. And so as a result of that, I would ask. But we're just the humble Ninth Circuit, and we do follow along behind what the Supreme Court tells us to do. Well, you know, my understanding is that the humble Ninth Circuit is not, you know, we're oftentimes not so much concerned about what the Supreme Court might eventually do, Your Honor. We always just try to do the right thing as far as the Ninth Circuit sees it. In any event, just one brief little other issue I wanted to discuss has to do with his motion to suppress, and it's having to do with, you know, statements that he confessed, and whether or not he was in custody at the time. This is another one of these sort of pet peeves that you see as a defense attorney. And the pet peeve of basically you have, you know, the police where Mr. Mina, clearly they have probable cause to arrest Mr. Mina. He is the focus of the investigation. They bring a tape recorder along with them just to play tapes for him and so forth and so on. And they go up to him, and rather than advising him of his Miranda warnings to two police officers, they basically say, look, we're here to ask you some questions. Would you mind coming with us? He goes, sure, no problem. They drive him to the police station. They put him in the room, and once they get him in the room, it's the first time that they actually say to him you're free to leave at this point. Assuming that's the case, why is it not harmless error? In other words, there was so much evidence against him, I mean, he was on tape. So let's assume that he was in custody. You know, much of Mr. Mina's defense at trial was, you know, was the defense that he was acting on his own, that he was not part of this conspiracy. So as far as in the circumstance of whether or not it's harmless or not, let's assume for a moment his confession comes out, we would still be able to put forward this argument that he accepted bribes, he took these bribes on his own without being part of the conspiracy. And in that regard, that would actually go to the amount of loss that he was responsible for. Well, wasn't there evidence that because two inspectors would go to every establishment, they would come back to the station house and there was a sharing of revenue? You know, Mr. Mina was not part of that sharing of revenue. There's no evidence that he ever got a nickel's worth out of it? I'm not saying there was no evidence. There were circumstances in which I believe in one or two times he was with another individual who gave him some money. But Mr. Mina was the individual who oftentimes, even in the record, it says that the other people didn't care for him. Some of them were even surprised he had been involved, and so they were trying to keep him in the dark, so to speak. With that in mind, if I may save the remaining time for rebuttal, if there are any further questions. Sure. Thank you very much. May it please the Court. Larry Tong, Assistant United States Attorney, arguing for the government. I admire Mr. Klein's approach in advocating what he wishes the law were. Obviously, we've gone through, I think to use this Court's words, a great sea change in sentencing law in the last 18 or 24 months. Now that it is becoming more clear as to what all of our respective obligations are, I think, frankly, he's asking this Court to overturn Supreme Court precedent, which, as Judge Fischer has pointed out, I think, humbly I suggest it would be inappropriate. With regard to the calculation of the loss, Judge Beezer, I believe that you have correctly characterized the approach of the district court. I think that this is a crime where, absent the tape recordings, it would be inherently difficult to quantify how much money passed hands. These are investigators that go to different bars every night, every single day of the year, 365 days, and they take varying amounts, sometimes none on one day, sometimes greater amounts on other days. We had the benefit, of course, of having an undercover cooperating individual who, for a period of one year, essentially recorded all of his conversations, as Your Honor pointed out, and turned over all of the money that was calculated. And I think the district court adopted an analysis that was eminently appropriate, given the circumstances of the case. How about with respect to Mr. Minna, though? How do you address the issue of when he joined this conspiracy? Since the first tape on him comes in 2000, I think it's put in December. That's correct, Your Honor. If I'm not mistaken. So he's pretty late in the sequencing, and yet his calculation of his amount of take out of this goes all the way back to early 1999. What's the support for that? His own admissions, for one, Your Honor. Which was what? Well, when he was interviewed by the agents, he essentially said that he started taking money in 1999 to finance trips to the Philippines. There are references in Addendum 3A to the pre-sentence report that essentially other witnesses and investigators noticed that prior to 1999, Mr. Minna had to borrow money from others in order to finance those trips, and his need to borrow money stopped in 1999, which corroborated his admissions to the agents. When in 1999? The record is not precisely clear as to that, which is why in the face of the defense objection, the pre-sentence report addendum said even if you were to excise the first quarter of 1999 for Mr. Minna, the projected figure would still exceed 200. What if you excise the first five months of 1999? That is below. That's a cutting number. I will concede at some point it goes below the bogey of $200,000, but if you were to excise the first three months, which I believe was consistent with his admissions of I believe it was four to five trips a year, I believe that that was a reasonable approach taken by the district court. If I may, Your Honor, I believe with Mr. Klein, you did ask him, well, what approach would you take, and he said, well, I would have the whole matter submitted to the jury for a determination. First off, that would be legally inappropriate. But secondly, I believe Your Honor referenced a case that you wrote saying that an extrapolation or a nonrigid formula would be appropriate. We've cited the West Coast Aluminum Heat Treating Company case on page 55 of our brief, which essentially says there is no rigid formula that is imposed upon the district court in calculating the loss in a fraud case. And noteworthy is the sentence of the court, and I will quote, nor is the district court obligated to search for the perfect theoretical or statistical fit. Well, I take that point. But what we're looking at, what I'm looking at here is the PSA. Whoa. Addendum 3. And it sets out the basis. It's not that the court's looking for something. What it's doing is following what is proffered by the government, which is a formula. Right. And if you can look to the formula, in the case in which I was, I recall, we did play with the formula or hold the government to the formula it was using. So once it starts down that road, it can say, well, you may not like the way we got it. So as long as there's enough evidence here, and I think you at least at first cut, I'd like to stick with the analysis of what seems to be the formula that was proffered by the government and adopted by the court. And if there's a variable there in which his trips or in which his participation in this conspiracy could shift it materially in terms of its sentencing, why wouldn't there be some need to be much more precise than sort of just going off on a statement about trips to the Philippines? Well. Because what they do is they say even if you take out some of his trips, conveniently it's three months. It's not four or five months. If they'd gone, even if you take out four months, maybe that would have, in the calculation, that would have dropped it below, I think. Oh, I agree in the abstract, Your Honor. I guess I was citing the standard just to indicate the court did the best with the evidence that it had available, granted at the urging of the government. And the extrapolation was conservative to start with because it was based on just the money taken by the undercover agent, who admittedly and per Judge Ezra's findings, was conservative in his approach. In other words, he was not particularly aggressive in soliciting the money. And I would remind the Court this is based on a factual finding, based on hearing many undercover recordings of Mr. Wiggins and his or the co-defendants who were his co-employees as investigators. He used that particular amount that was accepted by Mr. Wiggins. Mr. Wiggins actually worked less hours, that was in the record, than the other defendants. So that amount would tend to understate the total amounts, if one were to assume, and I suggest reasonably so, that the same amount of bribes would be paid to each, which would be in keeping with the nature of the enterprise. And Judge Ezra, reviewing the entire set of circumstances, actually said it would be substantially more than $200,000. Now, for precision as to when Mina made his first trip, I will have to concede we do not have that in the record. I will, however, again, urge that Mr. Mina voluntarily said, I started taking bribes in 1999. That was corroborated by the evidence in the addendum to the pre-sentence report. And Judge Ezra found that the $200,000 figure actually probably understated the total loss. I believe he used the flip side of the coin, saying that the amounts clearly exceeded $200,000, transcript May 12 of 2005 at page 25. And I think in the context of reviewing that court's determination and showing deference to the court, I believe that the evidence is sufficient to support the finding that the loss figure was appropriate. And, of course, the methodology, as I had stated earlier, is completely consistent with Booker, Fanfan, and Ameline, the en banc opinion. Your Honor, I believe as to the remaining issues, we've tried to address each of the issues raised by Mr. Mina in our brief. I'd be happy to address any of those points if the Court would like. On the in custody, wasn't he clearly in custody once they held him as long as they did, in the circumstances they did? Well, I think the factual predicate that is embodied in that question was rejected by the Court, and appropriately so. I don't believe he was held. They went to his place of residence and made a reasonable decision that interviewing him in the presence of his wife in a basically bedroom, in a multi-room boarding house, was not conducive to an interview or privacy or safety of the agents. They asked him whether he would accompany them to the police station. There are many precedents saying just because a suspect of an interrogation goes to the police station doesn't mean that he's in custody. They put him in the room and under circumstances where he was not made to feel like he was in custody, not facing the mirror so that it would appear to be custodial, and they asked him questions in a conversational tone. For how long? I will grant you the entire interview lasted 90 minutes, which is at the outer limits of what some of the earlier authorities of this Court say. But there was nothing custodial about it. He was told he didn't have to remain there. And, in fact, he walked home. It was a couple hundred yards, which I think was the proof in the pudding. Earlier they were going to walk to the station, but because this was before our torrential. He walked home after he'd given a statement. He did. He did. Yes. And after he gave a statement after being confronted with this inculpatory. This is true, Your Honor, but confronting a suspect with evidence of his guilt doesn't immediately turn the interview into something custodial. Certainly it's one of the factors in our five-part test. Without a doubt. And I suggest that the Court approves. So far the three that you mentioned all sort of weigh in favor of custody. I think under our precedent. Well, I would disagree because he was told basically he didn't have to go. He was told before he even went and volunteered to have the encounter that I want to ask you questions about your employment as a liquor investigator. I might point out also that there were factual determinations to be made, credibility determinations by the Court. One of the big issues that Mr. Mina seemed to raise was there was something inherently compulsive in the presence of law enforcement showing badges. Mr. Mina himself was quasi-law enforcement who carried a badge and by his own admission understood that that was both a symbol of authority as well as identification. The Court rejected many of the facts that I see the Court here advancing. Yet we find that he was in custody. What does that do to the case? Well, I believe that there still was ample evidence excising that such that the conviction should stand. Even though you've just said that one of the reasons for the loss finding was his admission that he entered the conspiracy in 1999? I don't think that goes to the guilt or innocence. If the Court were to reverse on the use of his statements, excuse me, not to reverse, but were to find that the statements were custodial. Was the statement made in the guilt or innocence phase of the trial or in the sentencing phase? The statement was made prior to the indictment being brought. So you said, therefore, if we were to find that he was in custody and it was a Miranda violation and his confession to the agent should be suppressed insofar as the guilt side, it would be harmless because there's lots of other evidence, but to the extent the government relies on his admission, that that's when he joined the conspiracy and then what? Here I have to confess I cannot recall whether or not that would carry over to the sentencing phase and require suppression in the sentencing phase if there were a violation of his Fifth Amendment rights. Okay. All right. Thank you, Your Honor. If there are no other questions, I would submit on the balance of the issues. Thank you. I don't think we have any. He doesn't have to. I don't know if we can catch up with Paul Skidmore. Thank you. Just very briefly, Your Honors. One is as far as going to the suppression issue, when Mr. Mina was initially approached and before he was taken to the police station, he was never advised at that point that he never had to go to the police station. And it's interesting to note that he walked home, but, of course, the police, because it was so warm out, felt it was necessary for them to drive Mr. Mina the couple of hundred yards rather than saying, why don't you meet us there, or why don't you drive yourself, or so forth and so on. And the only other thing is that it's also interesting is that they bothered to bring a tape recorder with them in order to play the tapes, because, of course, the interviews with Mr. Mina himself are never recorded. Thank you. Okay, fine. Thank you, counsel, for your arguments. The case just argued is submitted, and we'll stand and recess for the day. Thank you.
judges: B. Fletcher, Beezer, Fisher